(Slip Opinion)                OCTOBER TERM, 2005                1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ARLINGTON CENTRAL SCHOOL DISTRICT BOARD OF EDUCATION *v.* MURPHY ET VIR.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 05–18.   Argued April 19, 2006—Decided June 26, 2006

After respondents prevailed in their Individuals with Disabilities Education Act (IDEA) action to require petitioner school board to pay for their son's private school tuition, they sought fees for services rendered by an educational consultant during the proceedings, relying on an IDEA provision that permits a court to "award reasonable attorneys' fees as part of the costs" to prevailing parents, 20 U. S. C. §1415(i)(3)(B). The District Court granted their motion in part. Affirming, the Second Circuit noted that, under *Crawford Fitting Co.* v. *J. T. Gibbons, Inc.,* 482 U. S. 437, and *West Virginia Univ. Hospitals, Inc.* v. *Casey,* 499 U. S. 83, a cost- or fee-shifting provision will not be read to permit recovery of expert fees without explicit statutory authority, but concluded that a congressional Conference Committee Report relating to §1415(i)(3)(B) and a footnote in *Casey* referencing that Report showed that the IDEA authorized such reimbursement.

*Held:* Section §1415(i)(3)(B) does not authorize prevailing parents to recover expert fees. Pp. 3–12.

   (a) The resolution of this question is guided by the fact that Congress enacted the IDEA pursuant to the Spending Clause. While Congress has broad power to set the terms on which it disburses federal money to the States, any conditions it attaches to a State's acceptance of such funds must be set out "unambiguously." *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1, 17. Fund recipients are bound only by those conditions that they accept "voluntarily and knowingly," *ibid.,* and States cannot knowingly accept conditions of which they are "unaware" or which they are "unable to ascertain," *ibid.* Thus, the question here is whether the IDEA furnishes clear notice regarding expert fees. Pp. 3–4.

(b) The Court begins with the IDEA's text, for if its "language is plain," the courts' function ""'"is to enforce it according to its terms."'"" *Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U. S. 1, 6. While §1415(i)(3)(B) provides for an award of "reasonable attorneys' fees," it does not even hint that acceptance of IDEA funds makes a State responsible for reimbursing prevailing parents for the services of experts. "Costs" is a term of art that does not generally include expert fees. The use of "costs" rather than "expenses" strongly suggests that §1415(i)(3)(B) was not meant to be an open-ended provision making States liable for all expenses. Moreover, §1415(i)(3)(B) says not that a court may award "costs" but that it may award attorney's fees "as part of the costs." This language simply adds reasonable attorney's fees to the list of recoverable costs set out in 28 U. S. C. §1920, the general statute covering taxation of costs, which is strictly limited by §1821. Thus, §1415(i)(3)(B)'s text does not authorize an award of additional expert fees, and it certainly fails to present the clear notice required by the Spending Clause. Other IDEA provisions point strongly in the same direction. Of little significance here is a provision in the Handicapped Children's Protection Act of 1986 requiring the General Accounting Office to collect data on awards to prevailing parties in IDEA cases, but making no mention of consultants or experts or their fees. And the fact that the provision directed the GAO to compile data on the hours spent by consultants in IDEA cases does not mean that Congress intended for States to compensate prevailing parties for fees billed by these consultants. Pp. 4–8.

(c) *Crawford Fitting Co.* and *Casey* strongly reinforce the conclusion that the IDEA does not unambiguously authorize prevailing parents to recover expert fees. *Crawford Fitting Co.*'s reasoning supports the conclusion that the term "costs" in §1415(i)(3)(B), like "costs" in Federal Rule of Civil Procedure 54(d), the provision at issue there, is defined by the categories of expenses enumerated in 28 U. S. C. §1920. This conclusion is buttressed by the principle, recognized in *Crawford Fitting Co.,* that no statute will be construed to authorize taxing witness fees as costs unless the statute "refer[s] explicitly to witness fees." 482 U. S., at 445. The conclusion that the IDEA does not authorize expert fee awards is confirmed even more dramatically by *Casey*, where the Court held that 42 U. S. C. §1988, a fee-shifting provision with wording virtually identical to that of 20 U. S. C. §1415(i)(3)(B), did not empower a district court to award expert fees to a prevailing party. 482 U. S., at 102. The Second Circuit misunderstood the meaning of the *Casey* footnote on which it relied. That footnote did not state that the Conference Committee Report set out the correct interpretation of §1415(i)(3)(B) or provided the clear

notice required under the Spending Clause. Its thrust was simply that "attorneys' fees," standing alone, is generally not understood as encompassing expert fees. Pp. 8–11.

    (d) Respondents' additional arguments are unpersuasive. The IDEA's goals of "ensur[ing] that all children with disabilities have available to them a free appropriate public education," §1400(d)(1)(A), and of safeguarding parents' right to challenge adverse school decisions are too general to provide much support for their reading of the IDEA. And the IDEA's legislative history is insufficient help, where everything other than that history overwhelmingly suggests that expert fees may not be recovered. Pp. 11–12.

402 F. 3d 332, reversed and remanded.

    ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. GINSBURG, J., filed an opinion concurring in part and concurring in the judgment. SOUTER, J., filed a dissenting opinion. BREYER, J., filed a dissenting opinion, in which STEVENS and SOUTER, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 05–18

ARLINGTON CENTRAL SCHOOL DISTRICT BOARD OF EDUCATION, PETITIONER *v.* PEARL MURPHY ET VIR

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 26, 2006]

JUSTICE ALITO delivered the opinion of the Court.

The Individuals with Disabilities Education Act (IDEA or Act) provides that a court "may award reasonable attorneys' fees as part of the costs" to parents who prevail in an action brought under the Act. 111 Stat. 92, 20 U. S. C. §1415(i)(3)(B). We granted certiorari to decide whether this fee-shifting provision authorizes prevailing parents to recover fees for services rendered by experts in IDEA actions. We hold that it does not.

I

Respondents Pearl and Theodore Murphy filed an action under the IDEA on behalf of their son, Joseph Murphy, seeking to require petitioner Arlington Central School District Board of Education to pay for their son's private school tuition for specified school years. Respondents prevailed in the District Court, 86 F. Supp. 2d 354 (SDNY 2000), and the Court of Appeals for the Second Circuit affirmed, 297 F. 3d 195 (2002).

As prevailing parents, respondents then sought $29,350 in fees for the services of an educational consultant,

Marilyn Arons, who assisted respondents throughout the IDEA proceedings. The District Court granted respondents' request in part. It held that only the value of Arons' time spent between the hearing request and the ruling in respondents' favor could properly be considered charges incurred in an "action or proceeding brought" under the Act, see 20 U. S. C. §1415(i)(3)(B). 2003 WL 21694398, *9 (SDNY, July 22, 2003). This reduced the maximum recovery to $8,650. The District Court also held that Arons, a nonlawyer, could be compensated only for time spent on expert consulting services, not for time spent on legal representation, *id.,* at *4, but it concluded that all the relevant time could be characterized as falling within the compensable category, and thus allowed compensation for the full $8,650, *id.,* at *10.

The Court of Appeals for the Second Circuit affirmed. 402 F. 3d 332 (2005). Acknowledging that other Circuits had taken the opposite view, the Court of Appeals for the Second Circuit held that "Congress intended to and did authorize the reimbursement of expert fees in IDEA actions." *Id.*, at 336. The court began by discussing two decisions of this Court holding that expert fees could not be recovered as taxed costs under particular cost- or fee-shifting provisions. See *Crawford Fitting Co.* v. *J. T. Gibbons, Inc.,* 482 U. S. 437 (1987) (interpreting Fed. Rule Civ. Proc. 54(d) and 28 U. S. C. §1920); *West Virginia Univ. Hospitals, Inc.* v. *Casey,* 499 U. S. 83 (1991) (interpreting 42 U. S. C. §1988 (1988 ed.)). According to these decisions, the court noted, a cost- or fee-shifting provision will not be read to permit a prevailing party to recover expert fees without "'explicit statutory authority' indicating that Congress intended for that sort of fee-shifting." 402 F. 3d, at 336.

Ultimately, though, the court was persuaded by a statement in the Conference Committee Report relating to 20 U. S. C. §1415(i)(3)(B) and by a footnote in *Casey* that made reference to that Report. 402 F. 3d, at 336–337

(citing H. R. Conf. Rep. No. 99–687, p. 5 (1986)). Based on these authorities, the court concluded that it was required to interpret the IDEA to authorize the award of the costs that prevailing parents incur in hiring experts. 402 F. 3d, at 336.

We granted certiorari, 546 U. S. \_\_\_\_ (2006), to resolve the conflict among the Circuits with respect to whether Congress authorized the compensation of expert fees to prevailing parents in IDEA actions. Compare *Goldring* v. *District of Columbia*, 416 F. 3d 70, 73–77 (CADC 2005); *Neosho R-V School Dist.* v. *Clark ex rel. Clark*, 315 F. 3d 1022, 1031–1033 (CA8 2003); *T. D.* v. *LaGrange School Dist. No. 102*, 349 F. 3d 469, 480–482 (CA7 2003), with 402 F. 3d 332 (CA2 2005). We now reverse.

## II

Our resolution of the question presented in this case is guided by the fact that Congress enacted the IDEA pursuant to the Spending Clause. U. S. Const., Art. I, §8, cl. 1; see *Schaffer* v. *Weast*, 546 U. S. \_\_\_\_ (2005). Like its statutory predecessor, the IDEA provides federal funds to assist state and local agencies in educating children with disabilities "and conditions such funding upon a State's compliance with extensive goals and procedures." *Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty.* v. *Rowley,* 458 U. S. 176, 179 (1982).

Congress has broad power to set the terms on which it disburses federal money to the States, see, *e.g., South Dakota* v. *Dole,* 483 U. S. 203, 206–207 (1987), but when Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out "unambiguously," see *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1, 17 (1981); *Rowley, supra*, at 204, n. 26. "[L]egislation enacted pursuant to the spending power is much in the nature of a contract," and therefore, to be bound by "federally imposed conditions," recipients of federal funds

must accept them "voluntarily and knowingly." *Pennhurst*, 451 U. S., at 17. States cannot knowingly accept conditions of which they are "unaware" or which they are "unable to ascertain." *Ibid.* Thus, in the present case, we must view the IDEA from the perspective of a state official who is engaged in the process of deciding whether the State should accept IDEA funds and the obligations that go with those funds. We must ask whether such a state official would clearly understand that one of the obligations of the Act is the obligation to compensate prevailing parents for expert fees. In other words, we must ask whether the IDEA furnishes clear notice regarding the liability at issue in this case.

## III

### A

In considering whether the IDEA provides clear notice, we begin with the text. We have "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank* v. *Germain,* 503 U. S. 249, 253–254 (1992). When the statutory "language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U. S. 1, 6 (2000) (quoting *United States* v. *Ron Pair Enterprises, Inc.,* 489 U. S. 235, 241 (1989), in turn quoting *Caminetti* v. *United States,* 242 U. S. 470, 485 (1917); internal quotation marks omitted).

The governing provision of the IDEA, 20 U. S. C. §1415(i)(3)(B), provides that "[i]n any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs" to the parents of "a child with a disability" who is the "prevailing party." While this provision provides for an award of "reasonable attorneys' fees," this provision does

not even hint that acceptance of IDEA funds makes a State responsible for reimbursing prevailing parents for services rendered by experts.

Respondents contend that we should interpret the term "costs" in accordance with its meaning in ordinary usage and that §1415(i)(3)(B) should therefore be read to "authorize reimbursement of all costs parents incur in IDEA proceedings, including expert costs." Brief for Respondents 17.

This argument has multiple flaws. For one thing, as the Court of Appeals in this case acknowledged, "'costs' is a term of art that generally does not include expert fees." 402 F. 3d, at 336. The use of this term of art, rather than a term such as "expenses," strongly suggests that §1415(i)(3)(B) was not meant to be an open-ended provision that makes participating States liable for all expenses incurred by prevailing parents in connection with an IDEA case—for example, travel and lodging expenses or lost wages due to time taken off from work. Moreover, contrary to respondents' suggestion, §1415(i)(3)(B) does not say that a court may award "costs" to prevailing parents; rather, it says that a court may award reasonable attorney's fees "as part of the costs" to prevailing parents. This language simply adds reasonable attorney's fees incurred by prevailing parents to the list of costs that prevailing parents are otherwise entitled to recover. This list of otherwise recoverable costs is obviously the list set out in 28 U. S. C. §1920, the general statute governing the taxation of costs in federal court, and the recovery of witness fees under §1920 is strictly limited by §1821, which authorizes travel reimbursement and a $40 per diem. Thus, the text of 20 U. S. C. §1415(i)(3)(B) does not authorize an award of any additional expert fees, and it certainly fails to provide the clear notice that is required under the Spending Clause.

Other provisions of the IDEA point strongly in the same

direction.  While authorizing the award of reasonable
attorney's fees, the Act contains detailed provisions that
are designed to ensure that such awards are indeed rea-
sonable.  See §§1415(i)(3)(C)–(G).  The absence of any
comparable provisions relating to expert fees strongly
suggests that recovery of expert fees is not authorized.
Moreover, the lack of any reference to expert fees in
§1415(d)(2) gives rise to a similar inference.  This provi-
sion, which generally requires that parents receive "a full
explanation of the procedural safeguards" available under
§1415 and refers expressly to "attorneys' fees," makes no
mention of expert fees.

B

Respondents contend that their interpretation of
§1415(i)(3)(B) is supported by a provision of the Handi-
capped Children's Protection Act of 1986 that required the
General Accounting Office (GAO) to collect certain data,
§4(b)(3), 100 Stat. 797 (hereinafter GAO study provision),
but this provision is of little significance for present pur-
poses.  The GAO study provision directed the Comptroller
General, acting through the GAO, to compile data on,
among other things: "(A) the specific amount of attorneys'
fees, costs, and expenses awarded to the prevailing party" in
IDEA cases for a particular period of time, and (B) "the
number of hours spent by personnel, including attorneys
and consultants, involved in the action or proceeding, and
expenses incurred by the parents and the State educa-
tional agency and local educational agency."  *Id.,* at 797–
798.

Subparagraph (A) would provide some support for re-
spondents' position if it directed the GAO to compile data
on awards to prevailing parties of the expense of hiring
consultants, but that is not what subparagraph (A) says.
Subparagraph (A) makes no mention of consultants or

experts or their fees.[1]

Subparagraph (B) similarly does not help respondents. Subparagraph (B), which directs the GAO to study "the number of hours spent [in IDEA cases] by personnel, including . . . consultants," says nothing about the award of fees to such consultants. Just because Congress directed the GAO to compile statistics on the hours spent by consultants in IDEA cases, it does not follow that Congress meant for States to compensate prevailing parties for the fees billed by these consultants.

Respondents maintain that "Congress' direction to the GAO would be inexplicable if Congress did not anticipate that the expenses for 'consultants' would be recoverable," Brief for Respondents 19, but this is incorrect. There are many reasons why Congress might have wanted the GAO to gather data on expenses that were not to be taxed as costs. Knowing the costs incurred by IDEA litigants might be useful in considering future procedural amendments (which might affect these costs) or a future amendment regarding fee shifting. And, in fact, it is apparent that the

---

[1] Because subparagraph (A) refers to both "costs" and "expenses" awarded to prevailing parties and because it is generally presumed that statutory language is not superfluous, it could be argued that this provision manifests the expectation that prevailing parties would be awarded certain "expenses" not included in the list of "costs" set out in 28 U. S. C. §1920 and that expert fees were intended to be among these unenumerated "expenses." This argument fails because, whatever expectation this language might seem to evidence, the fact remains that neither 20 U. S. C. §1415 nor any other provision of the IDEA authorizes the award of any "expenses" other than "costs." Recognizing this, respondents argue not that they are entitled to recover "expenses" that are not "costs," but that expert fees *are* recoverable "costs." As a result, the reference to awards of both "expenses" and "costs" does not support respondents' position. The reference to "expenses" may relate to IDEA actions brought in state court, §1415(i)(2)(A), where "expenses" other than "costs" might be receivable. Or the reference may be surplusage. While it is generally presumed that statutes do not contain surplusage, instances of surplusage are not unknown.

GAO study provision covered expenses that could not be taxed as costs. For example, the GAO was instructed to compile statistics on the hours spent by all attorneys involved in an IDEA action or proceeding, even though the Act did not provide for the recovery of attorney's fees by a prevailing state or local educational agency.[2] Similarly, the GAO was directed to compile data on "expenses incurred by the parents," not just those parents who prevail and are thus eligible to recover taxed costs.

In sum, the terms of the IDEA overwhelmingly support the conclusion that prevailing parents may not recover the costs of experts or consultants. Certainly the terms of the IDEA fail to provide the clear notice that would be needed to attach such a condition to a State's receipt of IDEA funds.

## IV

Thus far, we have considered only the text of the IDEA, but perhaps the strongest support for our interpretation of the IDEA is supplied by our decisions and reasoning in *Crawford Fitting*, 482 U. S. 437, and *Casey,* 499 U. S. 83. In light of those decisions, we do not see how it can be said that the IDEA gives a State unambiguous notice regarding liability for expert fees.

In *Crawford Fitting*, the Court rejected an argument very similar to respondents' argument that the term "costs" in §1415(i)(3)(B) should be construed as an open-ended reference to prevailing parents' expenses. It was argued in *Crawford Fitting* that Federal Rule of Civil

—————

[2] In 2000, the attorneys' fees provision provided only an award to prevailing parents. See 20 U. S. C. §1415(i)(3)(B). In 2004, Congress amended §1415(i)(3)(B) to include two additional awards. See §101, 118 Stat. 2724. The amendments provided awards "to a prevailing party who is a State educational agency or local educational agency" where the complaint filed is frivolous or presented for an improper purpose, such as to harass, delay, or increase the cost of litigation. See 20 U. S. C. A. §§1415(i)(3)(B)(i)(II)–(III) (Supp. 2006).

Procedure 54(d), which provides for the award of "costs" to a prevailing party, authorizes the award of costs not listed in 28 U. S. C. §1821. 482 U. S., at 439. The Court held, however, that Rule 54(d) does not give a district judge "discretion to tax whatever costs may seem appropriate"; rather, the term "costs" in Rule 54(d) is defined by the list set out in §1920. *Id.,* at 441. Because the recovery of witness fees, see §1920(3), is strictly limited by §1821, the Court observed, a broader interpretation of Rule 54(d) would mean that the Rule implicitly effected a partial repeal of those provisions. *Id.,* at 442. But, the Court warned, "[w]e will not lightly infer that Congress has repealed §§1920 and 1821, either through Rule 54(d) or any other provision not referring explicitly to witness fees." *Id.*, at 445.

The reasoning of *Crawford Fitting* strongly supports the conclusion that the term "costs" in 20 U. S. C. §1415(i)(3)(B), like the same term in Rule 54(d), is defined by the categories of expenses enumerated in 28 U. S. C. §1920. This conclusion is buttressed by the principle, recognized in *Crawford Fitting,* that no statute will be construed as authorizing the taxation of witness fees as costs unless the statute "refer[s] explicitly to witness fees." 482 U. S., at 445; see also *ibid.* ("absent explicit statutory or contractual authorization for the taxation of the expenses of a litigant's witness as costs, federal courts are bound by the limitations set out in 28 U. S. C. §1821 and §1920").

Our decision in *Casey* confirms even more dramatically that the IDEA does not authorize an award of expert fees. In *Casey*, as noted above, we interpreted a fee-shifting provision, 42 U. S. C. §1988, the relevant wording of which was virtually identical to the wording of 20 U. S. C. §1415(i)(3)(B). Compare *ibid.* (authorizing the award of "reasonable attorneys' fees as part of the costs" to prevailing parents) with 42 U. S. C. §1988(b) (1988 ed.) (permit-

ting prevailing parties in certain civil rights actions to be awarded "a reasonable attorney's fee as part of the costs"). We held that §1988 did not empower a district court to award expert fees to a prevailing party. *Casey*, *supra*, at 102. To decide in favor of respondents here, we would have to interpret the virtually identical language in 20 U. S. C. §1415 as having exactly the opposite meaning. Indeed, we would have to go further and hold that the relevant language in the IDEA *unambiguously means* exactly the opposite of what the nearly identical language in 42 U. S. C. §1988 was held to mean in *Casey*.

The Court of Appeals, as noted above, was heavily influenced by a *Casey* footnote, see 402 F. 3d, at 336–337 (quoting 499 U. S., at 91–92, n. 5), but the court misunderstood the footnote's meaning. The text accompanying the footnote argued, based on an analysis of several fee-shifting statutes, that the term "attorney's fees" does not include expert fees. *Id.*, at 88–91. In the footnote, we commented on petitioners' invocation of the Conference Committee Report relating to 20 U. S. C. §1415(i)(3)(B), which stated: "'The conferees intend[ed] that the term "attorneys' fees as part of the costs" include reasonable expenses and fees of expert witnesses and the reasonable costs of any test or evaluation which is found to be necessary for the preparation of the . . . case.'" 499 U. S., at 91–92, n. 5 (quoting H. R. Conf. Rep. No. 99–687, at 5; ellipsis in original). This statement, the footnote commented, was "an apparent effort to *depart* from ordinary meaning and to define a term of art." 499 U. S., at 92, n. 5. The footnote did not state that the Conference Committee Report set out the correct interpretation of §1415(i)(3)(B), much less that the Report was sufficient, despite the language of the statute, to provide the clear notice required under the Spending Clause. The thrust of the footnote was simply that the term "attorneys' fees," standing alone, is generally not understood as encompassing expert fees. Thus, *Crawford*

*Fitting* and *Casey* strongly reinforce the conclusion that the IDEA does not unambiguously authorize prevailing parents to recover expert fees.

V

Respondents make several arguments that are not based on the text of the IDEA, but these arguments do not show that the IDEA provides clear notice regarding the award of expert fees.

Respondents argue that their interpretation of the IDEA furthers the Act's overarching goal of "ensur[ing] that all children with disabilities have available to them a free appropriate public education," 20 U. S. C. §1400(d)(1)(A) as well as the goal of "safeguard[ing] the rights of parents to challenge school decisions that adversely affect their child." Brief for Respondents 20. These goals, however, are too general to provide much support for respondents' reading of the terms of the IDEA. The IDEA obviously does not seek to promote these goals at the expense of all other considerations, including fiscal considerations. Because the IDEA is not intended in all instances to further the broad goals identified by the respondents at the expense of fiscal considerations, the goals cited by respondents do little to bolster their argument on the narrow question presented here.[3]

Finally, respondents vigorously argue that Congress clearly intended for prevailing parents to be compensated for expert fees. They rely on the legislative history of §1415 and in particular on the following statement in the

_____

[3] Respondents note that a GAO report stated that expert witness fees are reimbursable expenses. See Brief for Respondents 19 (citing GAO, Special Education: The Attorney Fees Provision of Public Law 99–372, p. 13 (Nov. 1989)). But this passing reference in a report issued by an agency not responsible for implementing the IDEA is plainly insufficient to provide clear notice regarding the scope of the conditions attached to the receipt of IDEA funds.

Conference Committee Report, discussed above: "The conferees intend that the term 'attorneys' fees as part of the costs' include reasonable expenses and fees of expert witnesses and the reasonable costs of any test or evaluation which is found to be necessary for the preparation of the . . . case." H. R. Conf. Rep. No. 99–687, at 5.

Whatever weight this legislative history would merit in another context, it is not sufficient here. Putting the legislative history aside, we see virtually no support for respondents' position. Under these circumstances, where everything other than the legislative history overwhelming suggests that expert fees may not be recovered, the legislative history is simply not enough. In a Spending Clause case, the key is not what a majority of the Members of both Houses intend but what the States are clearly told regarding the conditions that go along with the acceptance of those funds. Here, in the face of the unambiguous text of the IDEA and the reasoning in *Crawford Fitting* and *Casey*, we cannot say that the legislative history on which respondents rely is sufficient to provide the requisite fair notice.

\*     \*     \*

We reverse the judgment of the Court of Appeals for the Second Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

––––––––––

## No. 05–18

––––––––––

## ARLINGTON CENTRAL SCHOOL DISTRICT BOARD OF EDUCATION, PETITIONER *v.* PEARL MURPHY ET VIR

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 26, 2006]

JUSTICE GINSBURG, concurring in part and concurring in the judgment.

I agree, in the main, with the Court's resolution of this case, but part ways with the Court's opinion in one respect. The Court extracts from *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1, 17 (1981), a "clear notice" requirement, and deems it applicable in this case because Congress enacted the Individuals with Disabilities Education Act (IDEA), as it did the legislation at issue in *Pennhurst*, pursuant to the Spending Clause. *Ante*, at 3–4. That extraction, in my judgment, is unwarranted. *Pennhurst*'s "clear notice" requirement should not be unmoored from its context. The Court there confronted a plea to impose "an unexpected condition for compliance—a new [programmatic] obligation for participating States." *Bell* v. *New Jersey,* 461 U. S. 773, 790, n. 17 (1983). The controversy here is lower key: It concerns not the educational programs IDEA directs school districts to provide, but "the remedies available against a noncomplying [district]." *Ibid*; see *post*, at 9–11 (BREYER, J., dissenting).

The Court's repeated references to a Spending Clause derived "clear notice" requirement, see *ante*, at 3–4, 6, 8, 11, and n. 3, 12, are questionable on other grounds as well. For one thing, IDEA was enacted not only pursuant to

Congress' Spending Clause authority, but also pursuant to
§5 of the Fourteenth Amendment. See *Smith* v. *Robinson,*
468 U. S. 992, 1009 (1984) (IDEA's predecessor, the Educa-
tion of the Handicapped Act, was "set up by Congress to
aid the States in complying with their constitutional
obligations to provide public education for handicapped
children."). Furthermore, no "clear notice" prop is needed
in this case given the twin pillars on which the Court's
judgment securely rests. First, as the Court explains,
*ante*, at 4–6, the specific, attorneys'-fees-oriented, provi-
sions of IDEA, *i.e.*, 20 U. S. C. §1415(i)(3)(B)–(G);
§1415(d)(2)(L), "overwhelmingly support the conclusion
that prevailing parents may not recover the costs of ex-
perts or consultants," *ante*, at 8. Those provisions place
controls on fees recoverable for attorneys' services, without
mentioning costs parents might incur for other profes-
sional services and controls geared to those costs. Second,
as the Court develops, prior decisions closely in point
"strongly suppor[t]," even "confir[m] . . . dramatically,"
today's holding that IDEA trains on attorneys' fees and
does not authorize an award covering amounts paid or
payable for the services of an educational consultant.
*Ante*, at 9 (citing *Crawford Fitting Co.* v. *J. T. Gibbons, Inc.,*
482 U. S. 437 (1987), and *West Virginia Univ. Hospitals, Inc.*
v. *Casey,* 499 U. S. 83 (1991)).

For the contrary conclusion, JUSTICE BREYER's dissent
relies dominantly on a Conference Report stating the
conferees' view that the term "attorneys' fees as part of the
costs" includes "expenses and fees of expert witnesses" and
payments for tests necessary for the preparation of a case.
H. R. Conf. Rep. No. 99–687, p. 5 (1986) (internal quota-
tion marks omitted).[1] Including costs of consultants and

---

[1] The relevant statement from the Conference Report reads in its
entirety:
   "The conferees intend that the term 'attorneys' fees as part of the

tests in §1415(i)(3)(B) would make good sense in light of IDEA's overarching goal, *i.e.*, to provide a "free appropriate public education" to children with disabilities, §1400(d)(1)(A). See *post*, at 5–8 (BREYER, J., dissenting). But Congress did not compose §1415(i)(3)(B)'s text,[2] as it did the texts of other statutes too numerous and varied to ignore, to alter the common import of the terms "attorneys' fees" and "costs" in the context of expense-allocation legislation. See, *e.g.*, 42 U. S. C. §1988(c) (2000 ed. and Supp. III) (added in 1991 specifically to "include expert fees as part of the attorney's fee"); *Casey*, 499 U. S., at 88–92, and n. 4 (citing variously composed *statutes* that "explicitly shift expert . . . fees *as well as* attorney's fees"). Given the

———————

costs' include reasonable expenses and fees of expert witnesses and the reasonable costs of any test or evaluation which is found to be necessary for the preparation of the parent or guardian's case in the action or proceeding, as well as traditional costs incurred in the course of litigating a case." H. R. Conf. Rep. 99–687, at 5.

  Although the Conference Report goes on to consider other matters, including controls on attorneys' fees, nothing further is said on expert witness fees or test costs.

  [2]At the time the Conference Report was submitted to the Senate and House, sponsors of the legislation did not mention anything on the floor about expert or consultant fees. They were altogether clear, however, that the purpose of the legislation was to "reverse" this Court's decision in *Smith* v. *Robinson*, 468 U. S. 992 (1984). In *Smith*, the Court held that, under the statute as then designed, prevailing parents were not entitled to attorneys' fees. See 132 Cong. Rec. 16823 (1986) (remarks of Sen. Weicker) ("In adopting this legislation, we are rejecting the reasoning of the Supreme Court in Smith versus Robinson."); *id.*, at 16824 (remarks of Sen. Kerry) ("This vital legislation reverses a U. S. Supreme Court decision Smith versus Robinson[.]"); *id.*, at 17608–17609 (remarks of Rep. Bartlett) ("I support those provisions in the conference agreement that, in response to the Supreme Court decision in . . . Smith versus Robinson, authoriz[e] the awarding of reasonable attorneys' fees to parents who prevail in special education court cases."); *id.*, at 17609 (remarks of Rep. Biaggi) ("This legislation clearly supports the intent of Congress back in 1975 and corrects what I believe was a gross misinterpretation of the law. Attorneys' fees should be provided to those individuals who are being denied access to the educational system.").

constant meaning of the formulation "attorneys' fees as part of the costs" in federal legislation, we are not at liberty to rewrite "the statutory text adopted by both Houses of Congress and submitted to the President," *id.*, at 98, to add several words Congress wisely might have included. The ball, I conclude, is properly left in Congress' court to provide, if it so elects, for consultant fees and testing expenses beyond those IDEA and its implementing regulations already authorize,[3] along with any specifications, conditions, or limitations geared to those fees and expenses Congress may deem appropriate.    Cf. §1415(i)(3)(B)–(G); §1415(d)(2)(L) (listing only attorneys' fees, not expert or consulting fees, among the procedural safeguards about which school districts must inform parents).

In sum, although I disagree with the Court's rationale to the extent that it invokes a "clear notice" requirement tied to the Spending Clause, I agree with the Court's discussion of IDEA's terms, *ante*, at 4–6, and of our decisions in *Crawford* and *Casey*, *ante*, at 8–11.  Accordingly, I concur in part in the Court's opinion, and join the Court's judgment.

---

[3] Under 34 C. F. R. §300.502(b)(1) (2005), a "parent has the right to an independent educational evaluation at public expense if the parent disagrees with an evaluation obtained by the public agency."

# SUPREME COURT OF THE UNITED STATES

————

No. 05–18

————

## ARLINGTON CENTRAL SCHOOL DISTRICT BOARD OF EDUCATION, PETITIONER *v.* PEARL MURPHY ET VIR

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[June 26, 2006]

JUSTICE SOUTER, dissenting.

I join JUSTICE BREYER's dissent and add this word only to say outright what would otherwise be implicit, that I agree with the distinction he draws between this case and *Barnes* v. *Gorman,* 536 U. S. 181 (2002). See *post*, at 10–11 (citing *Barnes*, *supra*, at 191 (SOUTER, J., concurring)). Beyond that, I emphasize the importance for me of §4 of the Handicapped Children's Protection Act of 1986, 100 Stat. 797, as amended, 20 U. S. C. A. §1415 note, which mandated the study by what is now known as the Government Accountability Office. That section, of equal dignity with the fee-shifting provision enacted by the same statute, makes JUSTICE BREYER's resort to the related Conference Report the reasonable course.

# SUPREME COURT OF THE UNITED STATES

No. 05–18

ARLINGTON CENTRAL SCHOOL DISTRICT BOARD
OF EDUCATION, PETITIONER *v.* PEARL
MURPHY ET VIR

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[June 26, 2006]

JUSTICE BREYER, with whom JUSTICE STEVENS and JUSTICE SOUTER join, dissenting.

The Individuals with Disabilities Education Act (IDEA or Act), 20 U. S. C. A. §1400 *et seq.*, (Supp. 2006), says that a court may "award reasonable attorneys' fees as part of the costs to the parents" who are prevailing parties. §1415(i)(3)(B). Unlike the Court, I believe that the word "costs" includes, and authorizes payment of, the costs of experts. The word "costs" does not define its own scope. Neither does the phrase "attorneys' fees as part of costs." But Members of Congress did make clear their intent by, among other things, approving a Conference Report that specified that "the term 'attorneys' fees as part of the costs' include[s] reasonable expenses of expert witnesses and reasonable costs of any test or evaluation which is found to be necessary for the preparation of the parent or guardian's case in the action or proceeding." H. R. Conf. Rep. No. 99–687, p. 5 (1986); Appendix A, *infra,* at 19. No Senator or Representative voiced *any* opposition to this statement in the discussion preceding the vote on the Conference Report—the last vote on the bill before it was sent to the President. I can find no good reason for this Court to interpret the language of this statute as meaning the precise opposite of what Congress told us it intended.

I

There are two strong reasons for interpreting the statutory phrase to include the award of expert fees. First, that is what Congress said it intended by the phrase. Second, that interpretation furthers the IDEA's statutorily defined purposes.

A

Congress added the IDEA's cost-shifting provision when it enacted the Handicapped Children's Protection Act of 1986 (HCPA), 100 Stat. 796. Senator Lowell Weicker introduced the relevant bill in 1985. 131 Cong. Rec. 1979–1980 (1985). As introduced, it sought to overturn this Court's determination that the then-current version of the IDEA (and other civil rights statutes) did not authorize courts to award attorneys' fees to prevailing parents in IDEA cases. See *Smith* v. *Robinson,* 468 U. S. 992 (1984). The bill provided that "[i]n any action or proceeding brought under this subsection, the court, in its discretion, may award a reasonable attorney's fee as part of the costs to a parent or legal representative of a handicapped child or youth who is the prevailing party." 131 Cong. Rec. 1980; see S. Rep. No. 99–112, p. 2 (1985).

After hearings and debate, several Senators introduced a new bill in the Senate that would have put a cap on attorneys' fees for legal services lawyers, but at the same time would have explicitly authorized the award of "a reasonable attorney's fee, reasonable witness fees, and *other reasonable expenses of the civil action*, in addition to the costs to a parent . . . who is the prevailing party." *Id.,* at 7 (emphasis added). While no Senator objected to the latter provision, some objected to the cap. See, *e.g.*, *id.*, at 17–18 (Additional Views of Senators Kerry, Kennedy, Pell, Dodd, Simon, Metzenbaum and Matsunaga) (accepting cost-shifting provision, but objecting to cap and other aspects of the bill). A bipartisan group of Senators, led by

Senators Hatch and Weicker, proposed an alternative bill that authorized courts to award "a reasonable attorney's fee in addition to the costs to a parent" who prevailed. *Id.,* at 15–16 (Additional Views of Senators Hatch, Weicker, Stafford, Dole, Pell, Matsunaga, Simon, Kerry, Kennedy, Metzenbaum, Dodd, and Grassley); 131 Cong. Rec. 21389. Senator Weicker explained that the bill:

> "will enable courts to compensate parents for *whatever reasonable costs they had to incur to fully secure what was guaranteed to them by the EHA.* As in other fee shifting statutes, it is our intent that such awards will include, at the discretion of the court, reasonable attorney's fees, *necessary expert witness fees, and other reasonable expenses which were necessary for parents to vindicate their claim to a free appropriate public education for their handicapped child."* *Id.*, at 21390 (emphasis added).

Not a word of opposition to this statement (or the provision) was voiced on the Senate floor, and S. 415 passed without a recorded vote. *Id.*, at 21393.

The House version of the bill also reflected an intention to authorize recovery of expert costs. Following the House hearings, the Committee on Education and Labor produced a substitute bill that authorized courts to "award reasonable attorneys' fees, *expenses and costs*" to prevailing parents. H. R. Rep. No. 99–296, pp. 1, 5 (1985) (emphasis added). The House Report stated that

> "The phrase 'expenses and costs' includes *expenses of expert witnesses; the reasonable costs of any study, report, test, or project which is found to be necessary for the preparation of the parents' or guardian's due process hearing, state administrative review or civil action;* as well as traditional costs and expenses incurred in the course of litigating a case (e.g., depositions and interrogatories)." *Id.*, at 6 (emphasis added).

No one objected to this statement. By the time H. R. 1523
reached the floor, another substitute bill was introduced.
131 Cong. Rec. 31369 (1985). This new bill did not change
in any respect the text of the authorization of expenses
and costs. It did add a provision, however, that directed
the General Accounting Office (GAO)—now known as the
Government Accountability Office, see 31 U. S. C. A. §731
*note* (Supp. 2006)—to study and report to Congress on the
fiscal impact of the cost-shifting provision. See *id.*, at
31369–31370. The newly substituted bill passed the
House without a recorded vote. *Id.*, at 31377.

Members of the House and Senate (including all of the
primary sponsors of the HCPA) then met in conference to
work out certain differences. At the conclusion of those
negotiations, they produced a Conference Report, which
contained the text of the agreed-upon bill and a "Joint
Explanatory Statement of the Committee of the Confer-
ence." See H. R. Conf. Rep. No. 99–687 (1986), Appendix
A, *infra*. The Conference accepted the House bill's GAO
provision with "an amendment expanding the data collec-
tion requirements of the GAO study to include information
regarding the amount of funds expended by local educa-
tional agencies and state educational agencies on civil
actions and administrative proceedings." *Id.*, at 7. And it
accepted (with minor changes) the cost-shifting provisions
provided in both the Senate and House versions. The
conferees explained:

"With slightly different wording, both the Senate bill
and the House amendment provide for the awarding
of attorneys' fees in addition to costs. The Senate re-
cedes to the House and the House recedes to the Sen-
ate with an amendment clarifying that 'the court, in
its discretion, may award reasonable attorneys' fees
as part of the costs . . .' This change in wording incor-
porates the Supreme Court['s] *Marek* v. *Chesny* deci-

sion [473 U. S 1 (1985)]. *The conferees intend that the term 'attorneys' fees as part of the costs' include reasonable expenses and fees of expert witnesses and the reasonable costs of any test or evaluation which is found to be necessary for the preparation of the parent or guardian's case in the action or proceeding, as well as traditional costs incurred in the course of litigating a case.*" *Id.*, at 5 (emphasis added; citation omitted).

The Conference Report was returned to the Senate and the House. A motion was put to each to adopt the Conference Report, and both the Senate and the House agreed to the Conference Report by voice votes. See Appendix B, *infra*, at 22 (Senate); Appendix C, *infra*, at 23 (House). No objection was raised to the Conference Report's statement that the cost-shifting provision was intended to authorize expert costs. I concede that "sponsors of the legislation did not mention anything on the floor about expert or consultant fees" at the time the Conference Report was submitted. *Ante*, at 3, n. 2 (GINSBURG, J., concurring in part and concurring in judgment). But I do not believe that silence is significant in light of the fact that *every* Senator and *three of the five* Representatives who spoke on the floor had previously *signed his name* to the Conference Report—a Report that made Congress' intent clear on the first page of its explanation. See Appendix A, *infra*, at 19. And every Senator and Representative that took the floor preceding the votes voiced his strong support for the Conference Report. 132 Cong. Rec. 16823–16825 (1986) (Senate); *id.*, at 17607–17612 (House). The upshot is that Members of both Houses of Congress voted to adopt both the statutory text before us and the Conference Report that made clear that the statute's words include the expert costs here in question.

## B

The Act's basic purpose further supports interpreting

the provision's language to include expert costs.   The
IDEA guarantees a "free" and "appropriate" public educa-
tion for "all" children with disabilities. 20 U. S. C. A.
§1400(d)(1)(A) (Supp. 2006); see also §1401(9)(A) (defining
"free appropriate public education" as one "provided at
public expense," "without charge"); §1401(29) (defining
"special education" as "specially designed instruction, at
*no cost* to parents, to meet the unique needs of a child with
a disability" (emphasis added)).

Parents have every right to become involved in the Act's
efforts to provide that education; indeed, the Act encour-
ages their participation.   §1400(c)(5)(B) (IDEA "ensur[es]
that families of [disabled] children have meaningful oppor-
tunities to participate in the education of their children at
school").   It assures parents that they may question a
school district's decisions about what is "appropriate" for
their child.   And in doing so, they may secure the help of
experts.  §1415(h)(1) (parents have "the right to be accom-
panied and advised by counsel and by individuals with
special knowledge or training with respect to the problems
of children with disabilities"); see generally *Schaffer* v.
*Weast,* 546 U. S. ___, ___ (2005) (slip op., at 3–4) (detailing
Act's procedures); *Board of Ed. of Hendrick Hudson Central
School Dist., Westchester Cty.* v. *Rowley,* 458 U. S. 176, 205–
206 (1982) (emphasizing importance of Act's procedural
guarantees).

The practical significance of the Act's participatory
rights and procedural protections may be seriously dimin-
ished if parents are unable to obtain reimbursement for
the costs of their experts.   In IDEA cases, experts are
necessary.  See Kuriloff & Goldberg, Is Mediation a Fair
Way to Resolve Special Education Disputes? First Empiri-
cal Findings, 2 Harv. Negotiation L. Rev. 35, 40 (1997)
(detailing findings of study showing high correlation be-
tween use of experts and success of parents in challenging
school district's plan); Kuriloff, Is Justice Served by Due

Process?: Affecting the Outcome of Special Education
Hearings in Pennsylvania, 48 Law & Contemp. Prob. 89,
100–101, 109 (1985) (same); see also Brief for National
Disability Rights Network et al. as *Amici Curiae* 6–15
(collecting sources); cf. *Schaffer, supra*, at \_\_\_ (slip op., at
5) (GINSBURG, J., dissenting) ("[T]he vast majority of
parents whose children require the benefits and protec-
tions provided in the IDEA lack knowledge about the
educational resources available to their child and the
sophistication to mount an effective case against a district-
proposed IEP" (internal quotation marks and alterations
omitted)).

Experts are also expensive. See Brief for Respondents
28, n. 17 (collecting District Court decisions awarding
expert costs ranging from $200 to $7,600, and noting three
reported cases in which expert awards exceeded $10,000).
The costs of experts may not make much of a dent in a
school district's budget, as many of the experts they use in
IDEA proceedings are already on the staff. Cf. *Oberti* v.
*Board of Ed. Clementon School Dist.*, 995 F. 2d 1204, 1219
(CA3 1993). But to parents, the award of costs may mat-
ter enormously. Without potential reimbursement, par-
ents may well lack the services of experts entirely. See
Department of Education, M. Wagner et al., The Individ-
ual and Household Characteristics of Youth With Disabili-
ties: A Report from the National Longitudinal Transi-
tion Study–2 (NLTS–2), pp. 3–5 (Aug. 2003) (finding
that 25% of disabled children live in poverty and 65%
live in households with incomes less than $50,000); see
Department ofEducation, M. Wagner et al., The Child-
ren We Serve: The Demographic Characteristics of Ele-
mentary and Middle School Students with Disabilities
and Their Households, p. 28 (Sept. 2002), available at
http://www.seels.net/designdocs/SEELS_Children_We_
Serve_Report.pdf (as visited June 23, 2006, and available
in Clerk of Court's case file) (finding that 36% of disabled

children live in households with incomes of $25,000 or less).

In a word, the Act's statutory right to a "free" and "appropriate" education may mean little to those who must pay hundreds of dollars to obtain it. That is why this Court has previously avoided interpretations that would bring about this kind of result. See *School Comm. of Burlington* v. *Department of Ed. of Mass.,* 471 U. S. 359 (1985) (construing IDEA provision granting equitable authority to courts to include the power to order reimbursement for parents who switch their child to private schools if that decision later proves correct); *id.,* at 370 (without cost reimbursement for prevailing parents, "the child's right to a *free* appropriate public education, the parents' right to participate fully in developing a proper individualized education plan (IEP), and all of the procedural safeguards would be less than complete"); *Florence County School Dist. Four* v. *Carter,* 510 U. S. 7, 13 (1993) (holding that prevailing parents are not barred from reimbursement for switching their child to a private school that does not meet the IDEA's definition of a free and appropriate education). In *Carter*, we explained: "IDEA was intended to ensure that children with disabilities receive an education that is both appropriate and free. To read the provisions of §1401(a)(18) to bar reimbursement in the circumstances of this case would defeat this statutory purpose." *Id.,* at 13–14 (citation omitted).

To read the word "costs" as requiring successful parents to bear their own expenses for experts suffers from the same problem. Today's result will leave many parents and guardians "without an expert with the firepower to match the opposition," *Schaffer, supra*, at __ (slip op., at 11), a far cry from the level playing field that Congress envisioned.

II

The majority makes essentially three arguments against

this interpretation. It says that the statute's purpose and "legislative history is simply not enough" to overcome: (1) the fact that this is a Spending Clause case; (2) the text of the statute; and (3) our prior cases which hold that the term "costs" does not include expert costs. *Ante*, at 12. I do not find these arguments convincing.

## A

At the outset the majority says that it "is guided by the fact that Congress enacted the IDEA pursuant to the Spending Clause." *Ante*, at 3. "In a Spending Clause case," the majority adds, "the key is not what a majority of the Members of both Houses intend but what the States are clearly told regarding the conditions that go along with the acceptance of those funds." *Ante,* at 12. Thus, the statute's "conditions must be set out 'unambiguously.'" *Ante*, at 3–4 (citing *Pennhurst State School and Hospital* v. *Halderman,* 451 U. S. 1, 17 (1981) and *Rowley,* 458 U. S., at 204, n. 26). And "[w]e must ask" whether the statute "furnishes clear notice regarding the liability at issue in this case." *Ante*, at 4.

I agree that the statute on its face does not *clearly* tell the States that they must pay expert fees to prevailing parents. But I do not agree that the majority has posed the right question. For one thing, we have repeatedly examined the nature and extent of the financial burdens that the IDEA imposes without reference to the Spending Clause or any "clear-statement rule." See, *e.g.*, *Burlington, supra*, at 369 (private school fees); *Carter, supra,* at 13 (same); *Smith*, 468 U. S., at 1010–1011 (attorneys' fees); *Cedar Rapids Community School Dist.* v. *Garret F.,* 526 U. S. 66, 76–79 (1999) (continuous nursing service); but see *id.*, at 83 (THOMAS, J., joined by KENNEDY, J., dissenting). Those cases did not ask whether the statute "furnishes clear notice" to the affirmative obligation or liability at issue.

For another thing, neither *Pennhurst* nor any other case suggests that *every spending detail* of a Spending Clause statute must be spelled out with unusual clarity. To the contrary, we have held that *Pennhurst*'s requirement that Congress "unambiguously" set out "a condition on the grant of federal money" does *not* necessarily apply to legislation setting forth "*the remedies available against a noncomplying State.*" *Bell* v. *New Jersey,* 461 U. S. 773, 790, n. 17 (1983) (emphasis added) (rejecting *Pennhurst*-based argument that Elementary and Secondary Education Act of 1965 did not unambiguously provide that the Secretary could recover federal funds that are misused by a State). We have added that *Pennhurst* does not require Congress "specifically" to "identify" and "proscribe *each* condition in [Spending Clause] legislation." *Jackson* v. *Birmingham Bd. of Ed.,* 544 U. S. 167, 183 (2005) (rejecting argument that *Pennhurst* precluded interpreting Title IX's private cause of action to encompass retaliation (internal quotation marks and alterations omitted)); see also *Bennett* v. *Kentucky Dept. of Ed.,* 470 U. S. 656, 665–666 (1985). And we have denied any implication that "suits under Spending Clause legislation are suits in contract, or that contract-law principles apply to *all* issues that they raise." *Barnes* v. *Gorman,* 536 U. S. 181, 188–189, n. 2 (2002) (emphasis added).

These statements and holdings are not surprising. After all, the basic objective of *Pennhurst*'s clear-statement requirement does not demand textual clarity in respect to every detail. That is because ambiguity about the precise nature of a statutory program's details—particularly where they are of a kind that States might have anticipated—is rarely relevant to the basic question: Would the States have accepted the Federal Government's funds *had they only known* the nature of the accompanying conditions? Often, the later filling-in of details through judicial interpretation will not lead one to wonder whether fund-

ing recipients would have agreed to enter the basic program at all. Given the nature of such details, it is clear that the States would have entered the program regardless. At the same time, to view each statutory detail of a highly complex federal/state program (involving say, transportation, schools, the environment) simply through the lens of linguistic clarity, rather than to assess its meanings in terms of basic legislative purpose, is to risk a set of judicial interpretations that can prevent the program, overall, from achieving its basic objectives or that might well reduce a program in its details to incoherence.

This case is about just such a detail. Permitting parents to recover expert fees will not lead to awards of "indeterminate magnitude, untethered to compensable harm" and consequently will not "pose a concern that recipients of federal funding could not reasonably have anticipated." *Barnes*, 536 U. S., at 191 (SOUTER, J., joined by O'Connor, J., concurring) (citation and internal quotation marks omitted). Unlike, say, punitive damages, an award of costs to expert parties is neither "unorthodox" nor "indeterminate," and thus does not throw into doubt whether the States would have entered into the program. *Id.*, at 188. If determinations as to whether the IDEA requires States to provide continuing nursing services, *Cedar Rapids, supra*, or reimbursement for private school tuition, *Burlington, supra*, do not call for linguistic clarity, then the precise content of recoverable "costs" does not call for such clarity here *a fortiori*.

### B

If the Court believes that the statute's language is unambiguous, I must disagree. The provision at issue says that a court "may award reasonable attorneys' fees as part of the costs" to parents who prevail in an action brought under the Act. 20 U. S. C. A. §1415(i)(3)(B) (Supp. 2006). The statute neither defines the word "costs" nor

points to any other source of law for a definition. And the
word "costs," alone, says nothing at all about which costs
falls within its scope.

Neither does the statutory phrase—"as part of the costs
to the parents of a child with a disability who is the pre-
vailing party"—taken in its entirety unambiguously fore-
close an award of expert fees. I agree that, read literally,
that provision does not clearly grant authority to award
any costs at all. And one might read it, as the Court does,
as referencing another federal statute, 28 U. S. C. §1920,
which provides that authority. See *ante*, at 5; see also
§1920 (federal taxation of cost statute). But such a read-
ing is not inevitable. The provision (indeed, the entire
Act) says nothing about that other statute. And one can,
consistent with the language, read the provision as both
embodying a general authority to award costs while also
specifying the inclusion of "reasonable attorneys' fees" as
part of those costs (as saying, for example, that a court
"may award reasonable attorneys' fees as part of [a] costs
[award]").

This latter reading, while linguistically the less natural,
is legislatively the more likely. The majority's alternative
reading, by cross-referencing only the federal general cost-
awarding statute (which applies solely *in federal courts*),
would produce a jumble of different cost definitions appli-
cable to similar IDEA administrative and state-court
proceedings in different States. See §1920 ("A judge or
clerk of *any court of the United States* may tax as costs the
following. . . ." (emphasis added)). This result is particu-
larly odd, as all IDEA actions must begin in state due
process hearings, where the federal cost statute clearly
does not apply, and the overwhelming majority of these
actions are never appealed to *any* court. See GAO, Report
to the Ranking Minority Member, Committee on Health,
Education, Labor and Pensions, U. S. Senate, Special
Education: Numbers of Formal Disputes are Generally

Low and States Are Using Mediation and Other Strategies to Resolve Conflicts (GAO–03–897), p. 13 (2003) (approximately 3,000 administrative hearings annually; under 10% appealed to state or federal court); see also *Moore* v. *District of Columbia*, 907 F. 2d 165, 166 (CADC 1990) (en banc) (joining other Circuits in holding that IDEA authorizes an "award of attorney fees to a parent who prevails in [IDEA] administrative proceedings"). And when parents do appeal, they can file their actions in either state or federal courts. 20 U. S. C. A. §1415(i)(2)(A) (Supp. 2006).

Would Congress "obviously" have wanted the content of the word "costs" to vary from State to State, proceeding to proceeding? *Ante*, at 5. Why? At most, the majority's reading of the text is plausible; it is not the only possible reading.

C

The majority's most persuasive argument does not focus on either the Spending Clause or lack of statutory ambiguity. Rather, the majority says that "costs" is a term of art. In light of the law's long practice of excluding expert fees from the scope of the word "costs," along with this Court's cases interpreting the word similarly in other statutes, the "legislative history is simply not enough." *Ante*, at 12.

I am perfectly willing to assume that the majority is correct about the traditional scope of the word "costs." In two cases this Court has held that the word "costs" is limited to the list set forth in 28 U. S. C. §1920 and does not include fees paid to experts. See *Crawford Fitting Co.* v. *J. T. Gibbons, Inc.,* 482 U. S. 437 (1987) (interpreting Fed. Rule Civ. Proc. 54(d)); *West Virginia Univ. Hospitals, Inc.* v. *Casey,* 499 U. S. 83 (1991) (interpreting 42 U. S. C. §1988 (1988 ed.)). But Congress is free to redefine terms of art. See, *e.g.*, *Casey*, 499 U. S., at 88–90 (citing examples of statutes that shift "'costs of litigation (including . . . expert witness fees)'"). And we have suggested that it might well

do so through a statutory provision worded in a manner
similar to the statute here—indeed, we cited the Conference
Report language here at issue. *Id.,* at 91–92, n. 5 (charac-
terizing language as an "apparent effort to *depart* from
ordinary meaning and to define a term of art" and noting
that Congress made no such "effort" in respect to 42 U. S. C.
§1988).

Regardless, here the statute itself indicates that Con-
gress did not intend to use the word "costs" as a term of
art. The HCPA, which added the cost-shifting provision
(in §2) to the IDEA, also added another provision (in §4)
directing the GAO to "conduct a study of the impact of the
amendments to the [IDEA] made by section 2" over a 3½
year period following the Act's effective date. §4(a), 100
Stat. 797. To determine the fiscal impact of §2 (the cost-
shifting provision), §4 ordered the GAO to submit a report
to Congress containing, among other things, the following
information:

> "Data, for a geographically representative select sam-
> ple of States, indicating (A) *the specific amount of at-
> torneys' fees, costs, and expenses awarded to the pre-
> vailing party*, in each action and proceeding under
> [§2] from the date of the enactment of this Act
> through fiscal year 1988, *and* the range of such *fees,
> costs and expenses* awarded in the actions and pro-
> ceedings under such section, categorized by type of
> complaint and (B) for the same sample as in (A) *the
> number of hours spent by personnel, including attor-
> neys and consultants*, involved in the action or pro-
> ceeding, and expenses incurred by the parents and the
> State educational agency and local educational
> agency." §4(b)(3), *id.,* at 797–798 (emphasis added).

If Congress intended the word "costs" in §2 to authorize
an award of only those costs listed in the federal cost
statute, why did it use the word "expenses" in §4(b)(3)(A)

as part of the "amount awarded to the prevailing party"? When used as a term of art, after all, "costs" does not cover expenses. Nor does the federal costs statute cover any expenses—at least not any that Congress could have wanted the GAO to study. Cf. 28 U. S. C. §1920 (referring only once to "expenses," and doing so solely to refer to special interpretation services provided in actions initiated by the United States).

Further, why did Congress, when asking the GAO (in the statute itself) to study the "numbers of hours spent by personnel" include among those personnel both attorneys "*and consultants*"? Who but experts could those consultants be? Why would Congress want the GAO to study the hours that those experts "spent," unless it thought that it would help keep track of the "costs" that the statute imposed?

Of course, one might, through speculation, find other answers to these questions. One might, for example, imagine that Congress wanted the GAO to study the expenses that payment of expert fees engendered in state-court proceedings where state, but not federal, law requires that "'expenses' other than 'costs' might be receivable." *Ante*, at 7, n. 1; but see *supra*, at 12-13. Or one might think that the word "expenses" is surplusage. *Ante*, at 7, n. 1; but see *Duncan* v. *Walker,* 533 U. S. 167, 174 (2001) (expressing Court's "'reluctan[ce] to treat statutory terms as surplusage in any setting,'" but especially when they play "a pivotal role in the statutory scheme"). Or one might believe that Congress was interested in the hours these experts spent, but not in the fees they obtained. *Ante*, at 7. But these answers are not necessarily consistent with the purpose of the GAO study provision, a purpose revealed by the language of the provision and its position in the statute. Its placement and its reference to §2 indicate that Congress ordered the study to help it keep track of the magnitude of the reimbursements that an

earlier part of the new statute (namely, §2) mandated. See 100 Stat. 797 (stating that purpose of GAO study was to determine the "impact" of "section 2"). And the *only* reimbursement requirement that §2 mandates is the payment of "costs."

But why speculate about this? We *know* what Congress intended the GAO study to cover. It *told* the GAO in its Conference Report that the word "costs" included the costs of experts. And, not surprisingly, the GAO made clear that it understood precisely what Congress asked it to do. In its final report, the GAO wrote: "Parents can receive reimbursement from state or local education agencies for some or all of their attorney fees *and related expenses* if they are the prevailing party in part or all of administrative hearings or court proceedings. *Expert witness fees, costs of tests or evaluations found to be necessary during the case, and court costs for services rendered during administrative and court proceedings are examples of reimbursable expenses.*" GAO, Briefing Report to Congressional Requesters, Special Education: The Attorney Fees Provision of Public Law 99–372 GAO/HRD–22BR, p. 13 (Nov. 1989). At the very least, this amounts to *some* indication that Congress intended the word "costs," not as a term of art, not as it was used in the statutes at issue in *Casey* and *Crawford Fitting,* but rather as including certain additional "expenses." If that is so, the claims of tradition, of the interpretation this Court has given other statutes, cannot be so strong as to prevent us from examining the legislative history. And that history could not be more clear about the matter: Congress intended the statutory phrase "attorneys' fees as part of the costs" to include the costs of experts. See Part I, *supra.*

## III

For the reasons I have set forth, I cannot agree with the majority's conclusion. Even less can I agree with its fail-

ure to consider fully the statute's legislative history. That history makes Congress' purpose clear. And our ultimate judicial goal is to interpret language in light of the statute's purpose. Only by seeking that purpose can we avoid the substitution of judicial for legislative will. Only by reading language in its light can we maintain the democratic link between voters, legislators, statutes, and ultimate implementation, upon which the legitimacy of our constitutional system rests.

In my view, to keep faith with that interpretive goal, we must retain all traditional interpretive tools—text, structure, history, and purpose. And, because faithful interpretation is art as well as science, we cannot, through rule or canon, rule out the use of any of these tools, automatically and in advance. Cf. *Helvering* v. *Gregory*, 69 F. 2d 809, 810–811 (CA2 1934) (L. Hand, J.).

Nothing in the Constitution forbids us from giving significant weight to legislative history. By disregarding a clear statement in a legislative report adopted without opposition in both Houses of Congress, the majority has reached a result no Member of Congress expected or overtly desired. It has adopted an interpretation that undercuts, rather than furthers, the statute's purpose, a "free" and "appropriate" public education for "all" children with disabilities. See *Circuit City Stores, Inc.* v. *Adams,* 532 U. S. 105, 133 (2001) (STEVENS, J., joined by SOUTER, GINSBURG, and BREYER, JJ., dissenting) ("A method of statutory interpretation that is deliberately uninformed, and hence unconstrained, may produce a result that is consistent with a court's own views of how things should be, but it may also defeat the very purpose for which a provision was enacted"). And it has adopted an approach that, I fear, divorces law from life. See *Duncan, supra,* at 193 (BREYER, J., joined by GINSBURG, J., dissenting).

For these reasons, I respectfully dissent.

## APPENDIX A TO OPINION OF BREYER, J.

| 99TH CONGRESS<br>*2d Session* | HOUSE OF REPRESENTATIVES | REPORT<br>99–687 |
|---|---|---|

HANDICAPPED CHILDREN'S PROTECTION ACT OF 1986

JULY 16, 1986.—Ordered to be printed

Mr. HAWKINS, from the committee of conference,
submitted the following

## CONFERENCE REPORT

[To accompany S. 415]

The committee of conference on the disagreeing votes of the two Houses on the amendments of the House to the bill (S. 415), to amend the Education of the Handicapped Act to authorize the award of reasonable attorneys' fees to certain prevailing parties, and to clarify the effect of the Education of the Handicapped Act on rights, procedures, and remedies under other laws relating to the prohibition of discrimination, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses as follows:

That the Senate recede from its disagreement to the amendment of the House to the text of the bill and agree to the same with an amendment as follows:

In lieu of the matter proposed to be inserted by the House amendment, insert the following:

*[Text of Act omitted.]*

JOINT EXPLANATORY STATEMENT OF THE COMMITTEE OF CONFERENCE

The managers on the part of the House and the Senate at the conference on the disagreeing votes of the two Houses on the amendment of the House to the bill (S. 415) to authorize the award of attorneys' fees to certain prevailing parties, and to clarify the effect of the Education of the Handicapped Act on rights, procedures, and remedies under other laws relating to the prohibition of discrimination, and for other purposes, submit the following joint statement to the House and the Senate in explanation of the effect

Appendix A to opinion of BREYER, J.

of the action agreed upon by the managers and recommended in the accompanying conference report. The differences between the Senate bill and the House amendment and the substitute agreed to in the conference, are noted below, except for clerical corrections, conforming changes made necessary by agreements reached by the conferees, and minor drafting and clarifying changes.

1. The Senate bill provides for "a reasonable attorney's fee."
The House amendment provides for "reasonable attorneys' fees."
The Senate recedes.

2. With slightly different wording, both the Senate bill and the House amendment provide for the awarding of attorneys' fees in addition to costs.

The Senate recedes to the House and the House recedes to the Senate with an amendment clarifying that "the court, in its discretion, may award reasonable attorneys' fees as part of the costs . . ." This change in wording incorporates the Supreme Court *Marek* v. *Chesny* decision (87 L. Ed. 2d 1).

The conferees intend that the term "attorneys' fees as part of the costs" include reasonable expenses and fees of expert witnesses and the reasonable costs of any test or evaluation which is found to be necessary for the preparation of the parent or guardian's case in the action or proceeding, as well as traditional costs incurred in the course of litigating a case.

3. The Senate bill provides for the award of attorney's fees "to a parent or legal representative."
The House amendment provides for the award of attorneys' fees "to the parents or guardian."
The Senate recedes.

4. The Senate bill limits the amount of the fee awarded whenever a parent or legal representative is represented by a publicly funded organization which provides legal services.

The House amendment provides that fee awards shall be based on prevailing rates in the community.

The House recedes to the Senate and the Senate recedes to the House with an amendment clarifying that "fees awarded under this subsection shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished." See, *Hensley* v. *Eckerhart*, 461 U.S. 424 (1983); *Marek* v. *Chesny*, 87 L. Ed 2d 1 (1985); and *Blum* v. *Stenson*, 104 S. Ct. 1541 (1984). However, no such awards of attorneys' fees shall be calculated by using bonuses or multipliers. The conferees want to make it clear that the inclusion of the prohibition against calculation of fees using bonuses and multipliers is limited to cases brought only under part B of the Education of the Handicapped Act. The conferees do not intend in any way to diminish the applicability of interpretation by the U.S. Supreme Court regarding bonuses and multipliers to other statutes such as 42 U.S.C. 1988. See, *Hensley* v. *Eckerhart*, *Blum* v. *Stenson*, *Evans* v. *Jeff D.*, 106 S. Ct. 1531 (1986). In addition, several new sections would be added to clarify that under part B of the Education of the Handicapped Act, no award of attorneys' fees and related costs subject to the provision of the act may be made for services performed subsequent to the time a written offer of settlement is made to a party (if the

offer is made at least 10 days prior to the date of the action or pro-
ceeding) if the offer is not accepted within ten days and a court or
administrative officer finds that the relief finally obtained by the
party is not more favorable to the parent or guardian than the
offer of settlement. However, attorneys' fees may be awarded to a
prevailing parent or guardian who was substantially justified in re-
jecting the settlement offer. Furthermore, the court shall reduce
accordingly the amount of attorneys' fees and related expenses oth-
erwise allowable if they determine that:

(1) the parent or guardian, during the course of the action or
proceeding unreasonably protracted the final resolution of the
controversy;

(2) the amount of attorneys' fees otherwise authorized to be
awarded unreasonably exceeds the hourly rate prevailing in
the community for similar services by attorneys of reasonably
comparable skill, experience and reputation; or

(3) the time spent and legal services furnished were excessive
considering the nature of the action or proceeding.

Finally, the preceding situations in which the court reduces the
amount of fees and related expenses otherwise allowable shall not
apply if the local or state educational agency is determined to have
unreasonably protracted the final resolution of the action or pro-
ceeding or if a violation of section 615 of the Education of the
Handicapped Act is found.

The conferees intend that this provision clarify the application of
the *Marek* v. *Chesny* decision to the Handicapped Children's Pro-
tection Act. One exception is made to the applicability of the
*Marek* v. *Chesny* decision. When the parent or guardian is substan-
tially justified in rejecting the settlement offer, the *Marek* v.
*Chesny* decision would not apply. Substantial justification for rejec-
tion would include relevant pending court decisions which could
have an impact on the case in question.

In enumerating three conditions under which the amount of at-
torneys' fees would be reduced, the committee intends to protect
against excessive reimbursement. The second condition is a codifi-
cation of the policy for awarding fees in footnote 11 of *Blum* v.
*Stenson.*

5. The House amendment, but not the Senate bill, specifies that
fees, expenses, and costs awarded to the prevailing party may not
be paid with the funds provided under part B of EHA. The report
accompanying the Senate's bill restates existing policy that bars
the payment of such fees and the costs under part B.

The House recedes. The conferees wish to emphasize that exist-
ing law bars payment of attorneys' fees with funds appropriated
under B of EHA.

6. The House amendment, but not the Senate bill, provides for a
GAO study of the impact of the bill authorizing the awarding of
fees and costs.

The Senate recedes to the House with an amendment expanding
the data collection requirements of the GAO study to include infor-
mation regarding the amount of funds expended by local education-
al agencies and state educational agencies on civil actions and ad-
ministrative proceedings.

Appendix A to opinion of BREYER, J.

7. The House amendment, but not the Senate bill, sunsets the court's authority to award fees at the administrative level after a period of time specified in the legislation.

The House recedes.

8. With slightly different wording, both the Senate bill and the House amendment authorize the filing of civil actions under legal authorities other than part B of EHA so long as parents first exhaust administrative remedies available under part B of EHA to the same extent as would be required under that part.

The House recedes. It is the conferees' intent that actions brought under 42 U.S.C. 1983 are governed by this provision.

9. The House amendment, but not the Senate bill, requires public access to hearing decisions.

The House recedes. The conferees wish to emphasize that public access to hearing decisions is existing law.

10. The House amendment, but not the Senate bill, requires that the public educational agency provide parents with an opportunity to meet informally in an attempt to resolve a complaint.

The House recedes.

11. The House amendment, but not the Senate bill, includes an anti-retaliation provision.

The House recedes. It is the conferees' intent that no person may discharge, intimidate, retaliate, threaten, coerce, or otherwise take an adverse action against any person because such person has filed a complaint, testified, furnished information, assisted or participated in any manner in a meeting, hearing, review, investigation, or other activity related to the administration of, exercise of authority under, or right secured by part B of EHA. The term "person" the first time it is used means a state educational agency, local educational agency, intermediate educational unit or any official or employee thereof.

12. The House amendment, but not the Senate bill, makes retroactive its provision regarding the effect of EHA on other laws (section 3).

The House recedes.

AUGUSTUS F. HAWKINS,
MARIO BIAGGI,
PAT WILLIAMS,
CHARLES A. HAYES,
MATTHEW G. MARTINEZ,
DENNIS E. ECKART,
*Managers on the Part of the House.*

ORRIN HATCH,
LOWELL P. WEICKER, Jr.,
DON NICKLES,
TED KENNEDY,
JOHN F. KERRY,
*Managers on the Part of the Senate.*

APPENDIX B TO OPINION OF BREYER, J.
Excerpts from Congressional Record
132 Cong. Rec. 16823–16825 (1986) (Senate)

HANDICAPPED CHILDREN'S PROTECTION
ACT—CONFERENCE REPORT

Mr. WEICKER. Mr. President, I submit a report of the committee of conference on S. 415 and ask for its immediate consideration.

The PRESIDING OFFICER. The report will be stated.

The legislative clerk read as follows:

The committee of conference on the disagreeing votes of the two Houses on the amendments of the House to the bill (S. 415) to amend the Education of the Handicapped Act to authorize the award of reasonable attorneys' fees to certain prevailing parties, and to clarify the effect of the Education of the Handicapped Act on rights, procedures, and remedies under other laws relating to the prohibition on discrimination, having met, after full and free conference, have agreed to recommend and do recommend to their respective Houses this report, signed by a majority of the conferees.

The PRESIDING OFFICER. Without objection, the Senate will proceed to the consideration of the conference report.

*[Floor statements omitted.]*

Mr. WEICKER. Mr. President, I move adoption of the conference report.

The PRESIDING OFFICER. The question is on agreeing to the conference report.

The conference report was agreed to.

Mr. WEICKER. Mr. President, I move to reconsider the vote by which the conference report was agreed to.

APPENDIX C TO OPINION OF BREYER, J.
Excerpts from Congressional Record
132 Cong. Rec. 17607–17612 (House)

CONFERENCE REPORT ON S. 415, HANDICAPPED
CHILDREN'S PROTECTION ACT OF 1986

Mr. WILLIAMS. Mr. Speaker, I call up the conference report on the Senate bill (S. 415) to amend the Education of the Handicapped Act to authorize the award of reasonable attorneys' fees to certain prevailing parties, and to clarify the effect of the Education of the Handicapped Act on rights, procedures, and remedies under other laws relating to the prohibition of discrimination.

The Clerk read the title of the Senate bill.

*[Floor statements omitted.]*

Mr. WILLIAMS. Mr. Speaker, I yield back the balance of my time, and I move the previous question on the conference report.

The previous question was ordered.

The conference report was agreed to.